UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

| | |
|---|---|
| IN RE: MICHAEL and LUCINDA HARRIS | 4:03-bk-24855 E |
| | CHAPTER 7 |
| TWIN CITY BANK | PLAINTIFF |
| v.    AP NO.: 4:04-ap-1258 | |
| MICHAEL T. HARRIS and | |
| LUCINDA LEE HARRIS | DEFENDANTS |

### MEMORANDUM OPINION

Now before the Court is a Complaint, filed by Twin City Bank pursuant to 11 U.S.C. § 523(a)(2)(B) and an Answer filed by the Debtors. Trial in this adversary proceeding was held on January 12-13, 2005. The Court delivered its ruling orally on January 24, 2005; an order prepared by Defendants' counsel was approved and entered on the docket on February 15, 2005. This Memorandum Opinion supplements the February 15, 2005 Order dismissing Twin City Bank's complaint. It has come to the Court's attention that the law and facts of this case as set forth in the Court's oral ruling would be of educational benefit to the bankruptcy bar in general, and has accordingly decided to place the text of its oral ruling in this Memorandum Opinion, and to place such opinion on the Court's website.

### RULING

The Complaint is **DENIED** because the Court finds that the Bank did not prove the element of reasonable reliance, as required under 11 U.S.C. § 523(a)(2)(B) by a preponderance of the evidence, as I will explain later in this ruling.

## BASIS FOR RULING

Section 523(a)(2)(B) of the Bankruptcy Code, provides that a discharge in bankruptcy does not cover any money indebtedness obtained by use of a statement in writing-- (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive. In order to prevail, a creditor must prove all of these elements by a preponderance of the evidence.

Having reviewed the documentary evidence and testimony at trial, I find that the Statement of Net Worth (Exhibit A), dated April 23, 2001, which I will refer to as the "Financial Statement," the Purchase Money, Construction/Renovation, Refinance and Permanent Loan Agreement, dated Sept 20, 2001 ("Loan Agreement," Exhibit D), and the Modification Agreement, dated February 15, 2002 (Exhibit H), were materially false statements in writing respecting the Debtors' financial condition, but that the Bank failed to prove reasonable reliance on those representations, as I will explain further.

The Debtors desired to help their son Jody Harris. Jody Harris had been employed by an auto auction company for approximately 10 years, but the business was sold and he lost his job; and therefore, he wanted to start his own auto auction business. To that end, Mr. Harris entered into transactions with the Bank through a company known as JLH Properties, LLC, in order to obtain financing for the purchase of and improvements on certain real property located in Pulasksi County Arkansas where this auto auction facility would be

located.  Mr. Harris and Mr. Rex Bouldin, an accountant with whom the Debtors had a long standing relationship, were members of JLH Properties.  Mr. Harris had known Mr. Bouldin since the 1970s; in fact, Mr. Bouldin had prepared Mr. Harris' tax returns since 1978.  Because of this lengthy business relationship, Mr. Bouldin had access to the Debtors relevant financial documents.  The Debtors had Mr. Bouldin prepare their Financial Statement dated April 23, 2001, for the purpose of obtaining financing for the auto auction project.

There were serious inaccuracies in the Financial Statement at the time it was prepared.  This Financial Statement indicated that the Debtors' net worth was approximately $1.2 million.  However, the net worth of the Debtors contained in the Financial Statement was approximately double that reflected in a handwritten balance sheet prepared by Mr. Harris dated July 1998 (Exhibit 24).  The Financial Statement also reflects a value of $225,743 for Arkansas Concrete, LLC, a company then-owned by the Debtors.  It does not reflect, however, the fact that, at the time of the preparation of the Financial Statement, the Debtors had already agreed to sell their interest in Arkansas Concrete, LLC to their son Chad and his wife for $510,000.  These inaccuracies were further compounded by changes in the Debtors' financial condition over the course of the loan funding that were not disclosed to the Bank.  These changes related to the Debtors' real property and their interest in Harris Holdings Inc., as I will explain.  The Debtors' submitted the Financial Statement as part of the JLH loan package to the Bank.  The Financial Statement lists the net value of real property then-owned by the Debtors as follows: the Debtors' personal residence - $470,000, 6 acres for Future Development - $72,000 and a ½ acre lot - $17,000.  The Financial Statement also lists the

3

Debtors' 50% interest in Harris Holdings, Inc., an insurance agency, as having a value of $400,000.

The Loan Agreement was signed and executed on September 20, 2001, by Mr. Harris and Mr. Bouldin, as members of JLH, and by Mr. Gordon Silaski, on behalf of the Bank. Both the Debtors signed the Loan Agreement as guarantors. The Debtors warranted, according to paragraph 5(f) of this agreement, that the Financial Statement was truthful and fairly presented their financial conditions. Despite this warranty, the Debtors' failed to amend their Financial Statement to disclose that in May of 2001, they obtained a $320,000 loan from First National Bank of Paragould secured by all the real property listed in the Financial Statement, nor did the Debtors correct the prior inaccuracies already contained in the Financing Statement. Three hundred thousand dollars of this money was used as a down payment for the JLH auto auction real estate purchase. Ultimately, the Bank disbursed the $1.7 million referenced in the Loan Agreement.

In January 2002, the Debtors sold their personal residence, as well as all remaining real property and their interest in Harris Holdings, Inc., as identified on the Financial Statement to their son Kyle for $600,000, yet received no proceeds from this transfer. Due to construction cost overruns on the auto auction property, additional money was required to continue the auto auction project. In order to obtain these funds, on February 15, 2002, Mr. Harris and Mr. Bouldin signed the Modification Agreement, in which the Bank agreed to lend JLH an additional $255,000. Both the Debtors signed the Modification Agreement as guarantors. The Debtors again warranted, according to paragraph 6(a) of this agreement,

that the Financial Statement previously submitted was still accurate and that there had been no material adverse changes in their financial condition. This additional warranty was also inaccurate since the Debtors did not disclose the transfer to their son Kyle of Harris Holdings and all the real property listed on their Financial Statement plus Harris Holdings. Ultimately, due to insufficient cash flow, the auto auction project failed, and Bank foreclosed on the property. In December 2003, the Bank bought the property for $1.7 million at the foreclosure sale, and in January 2004, the Bank sold the property for $1.7925 million. In this adversary proceeding, the Bank seeks to have the approximately $390,000 deficiency excepted from discharge.

Turning now to the elements of § 523(a)(2)(B), I find that, in light of the facts as I have stated, the Financial Statement, Loan Agreement, and Modification Agreement were statements in writing respecting the Debtors' financial condition that were materially false. The Financial Statement was materially false and substantially inaccurate at the time it was submitted, since it did not correctly reflect the Debtors' financial situation at the time it was drafted. The Loan Agreement was also materially false to the extent that it warranted the continued accuracy of the Financial Statement submitted to Bank. These inaccuracies were compounded when the Debtors warranted that there had been no adverse change in their financial condition at the time of the Modification Agreement, when, for example, they no longer had any interest in Harris Holdings, which they had listed in the Financial Statement as having a value of $400,000.

I will now focus on the remaining elements of § 523(a)(2)(B). These elements are

5

whether the Debtors had an intent to deceive the Bank and whether the Bank reasonably relied on the Debtors' written representations.

### 1. **<u>Intent</u>**.

First, the Court considers whether the Debtors had the requisite intent to deceive the Bank. A reckless disregard of or reckless indifference to the truth of the information submitted by a debtor can satisfy the intent element of § 523(a)(2)(B). *In re Lawson*, 308 B.R. 417, 423 (Bankr. D. Neb. 2004). At the outset, I would note that there are no facts upon which it could be inferred that Mrs. Harris had an intent to deceive. She had no knowledge of the specifics of any of these transactions, signed the documents solely because she wanted to help her son Jody, and had no intent to deceive. Even if the Court were to have found that the Bank had reasonably relied on these statements, Mrs. Harris' debt would still be discharged, as she did not have the requisite intent to deceive.

As for Mr. Harris, I find his testimony regarding how the Financial Statement was prepared to be credible; I find that Mr. Bouldin prepared the Financial Statement. I further find that although Mr. Harris was not an astute, experienced businessman, he had some awareness of his own net worth apart from the Financial Statement prepared by Mr. Bouldin.

Mr. Harris was familiar with his net worth, since he had calculated this amount before, as seen in his handwritten balance sheet (Exhibit 24). This handwritten balance sheet lists the Debtors' assets, liabilities, and net worth during 1985 and 1986, and 1994 through 1998. Despite his familiarity and knowledge of his own net worth, Mr. Harris only "glanced" at the Financial Statement prepared by Mr. Bouldin, but did not adequately review or correct that

document. Had Mr. Harris properly reviewed the Financial Statement in April of 2001, he would have seen that it did not disclose that he had agreed to sell Arkansas Concrete to his son Chad, and that it showed his net worth to be twice that of which he was aware. This disparity in net worth should have raised questions in Mr. Harris' mind as to the accuracy of the Financial Statement. In addition, although Mr. Harris reaffirmed the Financial Statement in the Modification Agreement in February 2002, there was no disclosure that he had sold all of the Debtors' remaining real property and their interest in Harris Holdings, Inc. to their son. Surely, Mr. Harris must have known that he had transferred all the real property to his son, and that such a transfer would certainly and significantly impact in his financial condition.

Therefore, in light of Mr. Harris' knowledge of his net worth and his knowledge that he had or would transfer significant assets to family members, the Court finds that Mr. Harris demonstrated a reckless indifference to the accuracy of representations made to the Bank in the Financial Statement, the Loan Agreement, and the Modification Agreement, and therefore, that Mr. Harris intended to deceive the Bank.

### 2. **Lack of Reasonable Reliance**.

I will now address the Bank's lack of reasonable reliance on the Debtors' written representations. In order to prevail under § 523(a)(2)(B), the Bank must prove by a preponderance of evidence: (1) that it relied on the Debtor's written representations and (2) that such reliance was reasonable. *In re Cummins*, 166 B.R. 338, 352 (Bankr. W.D. Ark. 1994); *see also In re Pontow*, 111 F.3d 604 (8th Cir. 1997).

7

> The reasonableness of a creditor's reliance is to be determined in light of the totality of the circumstances. Among the factors to consider is whether there were any red flags that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*In re Lawson*, 308 B.R. 417, 422 (Bankr. D. Neb. 2004) (citations omitted). As I will explain, I find that the evidence demonstrates that the Bank did not rely on the Financial Statement or the Debtors' other written representations in disbursing the loans and that any such reliance on the Debtors' representations would not have been reasonable in light of how little information was actually requested and the nature of the financial information regarding the Debtors that the Bank did actually possess.

To begin the analysis, the Court notes that the Bank's President, Robert Birch had a personal relationship with the Debtors and was familiar with their family background. Jody Harris lived in Fayetteville, Arkansas with his twin brother, Kyle Harris, and Brent Birch, one of Mr. Birch's sons, when Kyle and Brent played baseball together. In addition, Jody and Mr. Birch's other son, Robert, were roommates when Jody moved to Little Rock. In fact, the genesis of the Bank's involvement in these matters was Jody's encounter with Mr. Birch at a hockey game. It was at this game that Jody first discussed the auto auction project with Mr. Birch. Other financial institutions had already declined to finance this project. However, following Jody Harris' and Mr. Birch's encounter at the hockey game, Mr. Birch put Jody in contact with Gordon Silaski, a senior loan officer employed by the Bank, and after various discussions with Mr. Silaski, the JLH loan package was submitted.

8

I will now address the contents of that loan package as those contents relate to the Debtors. The Bank obtained from the Debtors, as part of the JLH loan package, the Financial Statement that I have previously discussed, and the profit and loss statement from Arkansas Concrete, LLC. At trial, the Bank claimed that it reasonably relied on the Debtor's assertions contained in the Financial Statement and in the Loan Agreement and Modification Agreement in making the loans at issue. The Bank asserted that had it been aware of the inaccuracies in the Financial Statement, it would have structured these loans differently. However, the Bank's assertion of reasonable reliance is contradicted by its failure to obtain routine information normally used to evaluate a loan, much less one of this large an amount, in light of what it saw in the documents that were submitted. In fact, the Court finds that the Bank did not rely on the Debtors' written documents in making the loan, as I will explain.

First, the Bank did not require the Debtors to submit any personal tax returns for the JLH loans. Mr. Silaski testified that, although the Debtors' 2000 tax returns were part of the Bank's records, he did not receive them in conjunction with the loans at issue in this case. Rather, these records were provided for a subsequent home loan made by the Bank for the Debtors' purchase of a residence in Cabot, AR. These income tax returns indicate that for the year 2000, the Debtors' adjusted gross income was slightly under $10,000, yet their Financial Statement reflected their net worth as approximately $1.2 million. This low adjusted gross income is not a result of any complex accounting device. Rather, this tremendous disparity between the adjusted gross income and Debtors' stated net worth is simply the result of low cash flow. It is clear to the Court that if the Bank had undertaken

9

a minimal investigation and obtained the Debtors' 2000 tax returns, the Bank would have seen that these returns raise serious questions about the accuracy of the Financial Statement.

Second, there was no credit report run on the Debtors prior to the execution of the $1.7 million Loan Agreement. The credit report authorization (Exhibit 26) was not signed by the Debtors until January 24, 2002, while the $1.7 million Loan Agreement was made on September 20, 2001. Mr. Silaski stated that this credit report was provided to the bank in conjunction with the home loan to the Debtors, not for purposes of the JLH loan. As indicated by the mortgage and the Note & Security Agreement (Exhibits 32 & 33) both dated February 4, 2002, the amount of the home loan made by the Bank to the Debtors was $220,000. A credit report is standard information required prior to the extension of even minimal credit, much less a $1.7 million loan. Failure to request such a report suggests that the Bank was not relying on the Financial Statement.

Third, the profit and loss statement of Arkansas Concrete LLC provided as part of the JLH loan package (page 3 of Exhibit 26) indicated that from January - May 2001, Arkansas Concrete payed over $6,000 in interest expenses to the Deroe family, yet there was no evidence of any inquiry by the Bank regarding this expense. If the Bank were relying on the written financial information to determine the structure of the loan, additional information on this expense should certainly have been requested.

Fourth, the Bank, did not require submission of any profit and loss statement as to Harris Holding, although the Debtors' Financial Statement lists their interest in Harris Holding Inc., as being worth $400,000. The Financial Statement indicates that Harris

Holding is an insurance agency selling exclusively for Farmer's Home Mutual Ins. Co. of Paragould, and Farmer's Home was headed for many years by Mrs. Harris' father. Despite the Financial Statement's indication that Harris Holding, Inc. represented a significant portion of the Debtor's net worth, the Bank did not request any information concerning Harris Holdings' financial status. The question then becomes: if the Bank was relying on the Debtors' Financial Statement, why was a profit and loss statement obtained for Arkansas Concrete, an asset with a listed value of $225,745, while no such profit and loss statement was obtained for Harris Holdings, an asset with value of $400,000 as listed in the Financial Statement?

Finally, the email communication between Mr. Birch and Mr. Silaski (Exhibit 24) is particularly informative as to the Bank's alleged reliance. On the afternoon of April 23, 2001, after Mr. Silaski had received and reviewed the JLH loan package, including the Debtors' Financial Statement, Mr. Silaski sent an email to Mr. Birch indicating concern about the Debtors' finances. This email states in part as follows: "Mike Harris financials on your chair. Not all that impressive really . . . Where is the $250,000 cash coming from?" This question is a reference to the source of the down payment on the auto auction property, which the Bank required be made as part of this loan transaction. In light of this statement, it is clear that after reviewing the loan package, the Bank knew that the financial situation of the Debtors, contrary to Mr. Silaski's original stated expectations, was not strong. The Debtors' Financial Statement indicated that they had cash on hand totaling $61,275. Even including the $25,800 in First Paragould Bankshares stock, the total represents an amount

11

significantly less than the $250,000 that would be needed.  Thus, despite the concern as demonstrated by the email, the Bank ultimately proceeded with the loan.

When asked during this trial about the statement in the email regarding the $250,000, Mr. Silaski stated that he understood the money would come from Mrs. Harris' family, since she came from a "family of means, a banking family."  Mr. Birch also knew that Mrs. Harris came from a banking family.  In fact, Mr. Birch testified that he discussed Mrs. Harris' family history of banking with the individual that the Debtors had provided as a financial reference.  Mr. Birch specifically discussed Mrs. Harris' father, Mr. Ford, with the Debtors' financial reference.  Mr. Ford had been a prominent banker and Chairman of the Board of First National Bank in Paragould.  This evidence demonstrates that the Bank did not rely on the Financial Statement of the Debtors.  Rather, it relied on its expectation that Mrs. Harris' family would be the source of any additional funds that might be required, including the down payment.

Moreover, the Bank proceeded with the loan despite the fact that the Financial Statement shows that the Debtors lacked the cash needed, and the Bank did not obtain the Debtors' tax returns to examine their cash flow. Additionally, that the Bank did not obtain the Debtors' tax returns or a credit report in conjunction with a loan totaling $1.7 million, but did obtain them for the Debtors' home loan totaling $220,000, starkly demonstrates the lack of a minimal investigation into the Debtors' finances as relates to the JLH loans.

Viewed as a whole, the evidence before the Court demonstrates that, in fact, what the Bank was relying on was not the Debtors' Financial Statement or subsequent representations

of its accuracy, but rather the Bank's belief that Mrs. Harris' family money would be sufficient to support the Debtors' personal guarantees on the loans.

In addition, any reliance by the Bank on the Debtors' Financial Statement or their subsequent affirmations would have been unreasonable. Such reliance would have been unreasonable because the Bank actually possessed very little of the Debtors' information upon which it could base its decision. Moreover, the Financial Statement on its face does not list cash totaling anywhere near the $250,000 referenced in the Silaski email. In addition, even the scant information the Bank did have in its possession raised serious questions about the strength of Debtors' financial condition, as evidenced by the Silaksi email. Had the Bank undertaken a minimal investigation into the Debtors' finances for the JLH loans, such a minimal investigation would have included obtaining the Debtors' tax returns at least for the year 2000, a credit report, and a profit and loss statement for Harris Holdings. A review of these documents would have further revealed the weakness of the Debtors' financial position in contradiction to that contained in the Financial Statement.

## CONCLUSION

Considering all the facts, it is clear that the Bank really did not know and felt it did not need to know the Debtors' financial situation. Clearly, the Bank's reliance was not on the Debtors' written representations. The Court finds that under the totality of the circumstances, the Bank failed to prove reasonable reliance on the Debtors' written submissions.

_____
DATE:  January 26, 2007         HONORABLE AUDREY R. EVANS
                                UNITED STATES BANKRUPTCY JUDGE

EOD on 1/26/07 by BG

cc:	Randy Grice, attorney for plaintiff
	Basil Hicks, attorney for defendant(s)
	U.S. Trustee